# In the United States Court of Federal Claims

Nos. 11-400 C, 11-416 C
(CONSOLIDATED)

(Filed Under Seal: December 2, 2011)
(Reissued: December 19, 2011)[*]

```
*********************************************
JOINT VENTURE OF COMINT SYSTEMS      *
CORPORATION AND EYEIT.COM, INC.,     *
and NETSERVICES & ASSOCIATES, LLC,   *
                                     *
              Plaintiffs,            *      Postaward Bid Protest; 28 U.S.C.
                                     *      § 1491(b); Motions to Dismiss;
v.                                   *      RCFC 12(b)(1); Standing;
                                     *      Prejudice; "Substantial Chance" of
THE UNITED STATES,                   *      Receiving a Contract Award Absent
                                     *      Alleged Procurement Errors;
              Defendant,             *      Information Technology &
                                     *      Applications Corp.; Myers
and                                  *      Investigative & Security Services,
                                     *      Inc.; Rex Service Corp.
NETCENTRICS CORPORATION,             *
DIGITAL MANAGEMENT, INC., and        *
POWERTEK CORPORATION,                *
                                     *
              Defendant-Intervenors. *
*********************************************
```

---

[*] The parties proposed redactions to which they all agree, but plaintiff Joint Venture of Comint Systems Corporation and EyeIT.com, Inc. ("Comint") proffered additional redactions related to its evaluations and rankings to which the remaining parties objected. There exists a "presumption of public access to judicial records," and the court "must balance the privacy interests of the parties against the public interest in access to the . . . information." Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed. Cir. 2008) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998)). Comint's redactions are overly broad. The court has, on prior occasions, rejected the contention that government-assigned adjectival ratings have a bearing on the competitive process or could be viewed as confidential, proprietary or otherwise protected by protective orders entered in procurement protests. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 723 (2010) Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 311 n.1 (2009). Accordingly, the court adopts only those redactions, indicated by a bracketed ellipsis ("[. . .]"), to which all parties agreed. The court also makes a correction proposed by NetServices & Associates, LLC ("NetServices") to which the remaining parties do not object.

Philip F. Hudock, Reston, VA, for Joint Venture of Comint Systems Corporation and EyeIT.com, Inc. and David B. Dempsey and Jeffery M. Chiow, Washington, DC, for NetServices & Associates, LLC, for plaintiffs.

Alexander V. Sverdlov and Steven Michael Mager, United States Department of Justice, Washington, DC, for defendant.

Jeremy William Dutra, Robert E. Gregg, and Karen R. Harbaugh, Washington, DC, for NetCentrics Corporation, David Phillip Metzger, McLean, VA, for Digital Management, Inc., and Gerard F. Doyle, Arlington, VA, for PowerTek Corporation, for defendant-intervenors.

**OPINION AND ORDER**

**SWEENEY**, Judge

Plaintiffs Comint and NetServices protest awards issued by the United States Department of Defense ("Defense Department") during its Net-Centric Integrated Enterprise Information Technology Solutions ("NIEITS") acquisition of information technology ("IT") services and seek various forms of declaratory and injunctive relief. NetCentrics Corporation ("NetCentrics"), Digital Management, Inc. ("DMI"), and PowerTek Corporation ("PowerTek"), the three contract awardees, intervened in defense of the award. Currently pending before the court are plaintiffs' motions for judgment upon the administrative record and for declaratory and injunctive relief, defendant's motions to dismiss, and defendant-intervenors' motions to dismiss and cross-motions for judgment upon the administrative record. For the reasons set forth below, the court determines that plaintiffs fail to establish standing to bring their protests. Accordingly, the court denies plaintiffs' motions for judgment upon the administrative record and for declaratory and injunctive relief, grants defendant's motions to dismiss plaintiffs' second amended complaints, grants in part and denies in part as moot NetCentrics' combined motion to dismiss plaintiffs' second amended complaint and for judgment upon the administrative record, grants DMI's motions to dismiss plaintiffs' second amended complaints, denies as moot DMI's cross-motions for judgment upon the administrative record, grants PowerTek's motions to dismiss plaintiffs' second amended complaints, and denies as moot PowerTek's cross-motions for judgment upon the administrative record.

**I. FACTUAL BACKGROUND**[1]

**A. Agency Structure**

The NIEITS acquisition represented a Defense Department effort to obtain IT services to support the Office of the Secretary of Defense ("OSD"), the Washington Headquarters Services

---

[1] The facts are derived from the administrative record ("AR"). See infra Part II.C.1.

("WHS"), and the Pentagon Force Protection Agency ("PFPA").[2]  AR 342.  For purposes of the NIEITS acquisition, the OSD, the WHS, and the PFPA, among other entities, were considered part of the Director of Administration and Management ("DA&M") IT community.  Id. at 6.

The DA&M IT community contracted with approximately thirteen different companies for IT help desk, server, network, and applications support services.  Id. at 7, 352.  These various contracts resulted in uncoordinated purchasing of equipment and services.  Id. at 7.  In response, the WHS determined that combining the existing contracts "to obtain a full range of integrated enterprise net-centric IT supplies and services," id. at 343, would achieve numerous organizational goals, see id. at 343-44; see also id. at 6 (indicating that the WHS sought "seamless, reliable, and responsive enterprise solutions for IT services . . . that improve existing services resulting in a stable and secure enterprise IT network").  The WHS considered five different methods by which to achieve these objectives and ultimately selected a multiple award, indefinite delivery/indefinite quantity ("ID/IQ") contract vehicle for small businesses with a size standard of $25 million.  Id. at 8-9, 239.

### B. The Solicitation

On August 2, 2010, the WHS issued solicitation No. HQ0034-10-R-0046 to award a minimum of two ID/IQ contracts that "provide[d IT] solutions through performance of a broad range of services which include[d] the integration of various types of support critical to the services being acquired."  Id. at 247.  The contract awardees were to "provide labor, hardware/ software, and other equipment and materials required to provide a wide range of net-centric integrated IT support, services, and supplies for customers and organizations to support IT systems and customers in the DA&M IT community . . . ."  Id. at 344.

The solicitation was comprised of three elements: (1) a Basic Contract; (2) Task Order 1, Enterprise IT Operations Services ("Task Order 1"); and (3) Task Order 2, Enterprise IT Engineering Support Services ("Task Order 2").[3]  Id. at 159.  The Basic Contract consisted of a twenty-four-month base period and three twelve-month option periods.  Id. at 247, 6783.  The total minimum guaranteed by the government for the base period was $2,500 for each awardee,

---

[2]  The OSD exercises authority, direction, and control over policy development, planning, resource management, fiscal, and program evaluation.  AR 349, 6776.  Its chief information officer is responsible for designing, constructing, implementing, and maintaining common IT services for OSD components known as Principle Staff Elements.  Id. at 349.  The WHS, through its IT management directorate, provides a full array of IT products and services to the WHS community, the OSD, and other Defense Department components within a centralized, consolidated services environment.  Id. at 342.  The PFPA is a civilian defense agency that protects and safeguards the Pentagon and other facilities.  Id.

[3]  A task order is "an order for services placed against an established contract or with Government sources."  48 C.F.R. § 2.101 (2010).

and the total maximum quantity of all supplies and services, including all option periods, under the Basic Contract could not exceed $495 million.  Id.  The solicitation authorized three types of task orders: firm-fixed-price;[4] firm-fixed-price, level-of-effort term;[5] and cost-reimbursement.[6] Id. at 249, 6783.  An individual task order could relate to one major task area or involve functions from multiple task areas.[7]  Id. at 345.

## 1.  Solicitation Elements

The Basic Contract consisted of a schedule of labor rates for workers in specified categories.  Task Order 1 identified eight functional areas of contract performance.[8]  Id. at 6363.

---

[4]  A firm-fixed-price task order "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1.  This type of task order places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loses.  Id.  It also provides "maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."  Id.

[5]  A firm-fixed-price, level-of-effort term task order requires the contractor to provide a specified level of effort for a stated period of time on work that can be stated only in general terms.  48 C.F.R. § 16.207-1.  It also requires the government to pay the contractor a fixed dollar amount.  Id.  This type of task order "is suitable for investigation or study in a specific research and development area.  The product of the contract is usually a report showing the results achieved through application of the required level of effort.  However, payment is based on the effort expended rather than on the results achieved."  Id.

[6]  A cost-reimbursement task order provides for payment of allowable incurred costs, to the extent prescribed in the task order.  48 C.F.R. § 16.301-1.  This type of task order establishes an estimate of total costs for the purpose of obligating funds and establishing a ceiling that the contractor cannot exceed, save at its own risk, without the approval of the contracting officer.  Id.

[7]  The solicitation's statement of objectives identified nine major task areas: (1) customer support; (2) systems operation, administration, and maintenance; (3) applications support (including development and maintenance, e-business systems administration, software system development, and engineering); (4) business continuity and continuity of operations; (5) hardware and software acquisition; (6) enterprise architecture and engineering services; (7) performance management; (8) project management; and (9) IT training services.  AR 344-47.

[8]  These areas included: (1) program and project management; (2) manage and implement change; (3) operations and maintenance support (service operations); (4) configuration management support (service asset and configuration management); (5) integrated logistics and asset management support; (6) security operations support; (7) standardize base work station images; and (8) OSD continuity of operations and continuity of business.  AR 6365-81.

The contractor's performance goal under Task Order 1 was to "[p]rovide seamless, reliable, and responsible enterprise solutions" for IT services.  Id. at 6382.  Performance standards included creating a stable and secure enterprise IT network that (1) met functionality, speed, and capacity expectations of OSD end users and (2) complied with Defense Department and federal rules and regulations.  Id.

Task Order 2 identified six areas of contractor support through which the Defense Department would acquire advisory and assistance services to support and improve IT operations.[9]  Id. at 6390.  Task Order 2 enumerated ten individual tasks, five of which were optional.  See id. at 6393-413.  The contractor was not required to perform inherently governmental functions under Task Order 2.  Id. at 6390.  Activities and deliverables were specified by the government, and the method and manner of performance were determined by the contractor.  Id.

## 2.  Evaluation of Proposals

The government intended to award contracts to responsible offerors with proposals that (1) complied with the solicitation's provisions, (2) were responsive to the solicitation's requirements, (3) demonstrated the offeror's ability to perform the breadth and scope of the requirements, (4) set forth a price that was determined by the contracting officer to be fair and reasonable, and (5) represented the overall best value to the government.  Id. at 335.  Offerors were required to propose on each element of the solicitation.  Id.  The government intended to make awards without discussions, but it reserved the right to conduct discussions if they were deemed necessary by the contracting officer.  Id. at 144.

### a.  Offeror Eligibility

Only eligible offers were evaluated for a contract award.  Id. at 336.  A proposal was considered eligible for an award only if it satisfied "minimum eligibility criteria" that were evaluated by the WHS on a pass/fail basis.  Id.  First, the offeror had to unconditionally accept the solicitation's terms and conditions.  Id.  Second, the offeror had to timely submit all required information.  Id.  Third, all members of the offeror's team had to possess active top secret facilities clearances on the date the offeror submitted its proposal.  Id.  The WHS notified offerors in writing if their proposals received "pass" ratings for each category.  Id.  Those offerors receiving "pass" ratings for all three categories received invitations to give real-time oral

---

[9]  These areas included: (1) enterprise technical architecture; (2) project plans with well-defined milestones, costs, equipment, and license requirements; (3) implementation plan with realistic schedule and milestones; (4) thorough documentation; (5) application development and support; and (6) engineering support activities.  AR 6390.

proposal presentations, which became part of the offeror's proposal.[10]  Id. at 136, 328, 335.  The WHS rejected any offeror's proposal that was deemed ineligible, and that offeror's proposal was precluded from further consideration.  Id. at 336.

### b.  Basic Contract

The WHS evaluated Basic Contract proposals on three factors.  The first factor, Quality/Capability, had three subfactors–corporate commitment, internal resources, and corporate experience–under the written proposal and five subfactors–program management, corporate commitment, internal and external resources, corporate experience, and subcontractor management–under the oral proposal.  Id. at 335-36.  These subfactors were listed in descending order of importance.  Id. at 337.  The second factor, Past Performance, was comprised of three subfactors: the Basic Contract, Task Order 1, and Task Order 2.  Id. at 336.  The third factor, Price, represented the combined, total evaluated amount of the Basic Contract and both task orders.  Id.

The Quality/Capability factor was accorded greater importance than the Past Performance factor.  Id.  When combined, the Quality/Capability and Past Performance factors were more important than the Price factor.  Id.  The importance of the Price factor increased as the two nonprice factors became equal.  Id.  All subfactors carried equal weight.  Id.  Proposals that the WHS determined represented the best value to the government for a Basic Contract award were further evaluated for an award of each task order.  Id. at 337.

### c.  Task Order 1 and Task Order 2

The WHS evaluated proposals for each task order based on the same three factors used to evaluate the Basic Contract.  Id.  The Quality/Capability factor was comprised of three subfactors–corporate experience, transition plan, and responses to questions during the oral proposal presentation–and was accorded greater importance than the Past Performance factor.  Id. at 337.  When combined, the Quality/Capability and Past Performance factors were more important than the Price factor.  Id.  The importance of the Price factor increased as the two nonprice factors became equal.  Id.  All subfactors carried equal weight.  Id.

---

[10]  The oral proposal presentation was designed to test each offeror's understanding of the government's requirements and enable the WHS to seek any clarifications.  AR 328.  Oral proposal presentations included a question and answer ("Q&A") session, id. at 328, 335, but neither the oral proposal presentation nor the Q&A session constituted "discussions" as defined in Federal Acquisition Regulation ("FAR") 15.306(d).  Id. at 328; cf. 48 C.F.R. § 15.306(d) (defining "discussions" as negotiations conducted in a competitive acquisition that occur after establishment of the competitive range).  Neither the oral proposal presentation nor the Q&A session obligated the WHS to conduct discussions, solicit offer revisions, or solicit final proposal revisions.  AR 328.

#### d.  Rating the Proposals

##### i.  Adjectival Ratings for the Quality/Capability Factor

To determine an offeror's Quality/Capability factor rating, the WHS assessed the quality, realism, and completeness of each proposal and evaluated the extent to which the proposal ensured high quality performance.  Id.  The WHS assigned proposals one of five adjectival ratings: "outstanding"; "good"; "acceptable"; "marginal"; and "unacceptable."  Id.  A rating of "unacceptable" rendered an offeror's entire proposal unacceptable, and that proposal was not considered for an award.  Id.

##### ii.  Adjectival Ratings for the Past Performance Factor

To determine an offeror's Past Performance factor rating, the WHS assessed an offeror's relevant work, which was defined as "work that [wa]s similar in size (in terms of users), scope, complexity and price to the solicited work performed" after August 1, 2005.  Id. at 338.  The WHS did not assign a favorable or unfavorable rating to offerors that did not have a record of relevant past performance or for which information about past performance was not available. Id.  In such cases, offerors received a neutral rating that had neither a positive nor negative evaluative significance.  Id.  A neutral evaluation, however, could affect an offeror's ranking relative to other offerors.  Id.

The WHS determined "how recent and relevant a specific effort accomplished by the offeror [wa]s to the effort to be acquired" for NIEITS.  Id.  First, the WHS determined the relevance of an offeror's past performance, assigning one of five adjectival ratings: "very relevant"; "relevant"; "somewhat relevant"; "not relevant"; and "neutral."  Id.  Second, the WHS determined how well the offeror performed, assigning one of five adjectival ratings for past performance assessment: "outstanding"; "excellent"; "adequate"; "marginal"; and "not observed."  Id. at 339.  The WHS then combined the two past performance components to assign one of six adjectival ratings for past performance confidence: "substantial confidence"; "satisfactory confidence"; "limited confidence"; "no confidence"; "unknown confidence"; and "neutral."  Id.  A rating of "no confidence" rendered an offeror's entire proposal unacceptable, and that proposal was not considered for an award.  Id.

##### iii.  Evaluation of the Price Factor

The WHS evaluated the price reasonableness of an offeror's total evaluated amount of the Basic Contract and both task orders by utilizing price analysis techniques set forth in FAR 15.404-1.[11]  Id. at 340.  In addition to evaluating both task orders for price reasonableness, the WHS also "determine[d] if the offeror's proposed price reflect[ed] the offeror's understanding of

---

[11]  Seven price analysis techniques and procedures may be used to ensure a fair and reasonable price.  See 48 C.F.R. § 15.404-1(b)(2)(i)-(vii).

the requirements and if the proposed price [wa]s consistent with the offeror's proposal for the Basic Contract." Id.  The WHS did not assign an adjectival rating under the Price factor.  Id.

The solicitation advised offerors that the contracting officer "anticipate[d] that pricing for the acquisition [would] be based on adequate price competition and therefore [did] not require submission or certification of cost or pricing data . . . ." Id. at 333.  Offerors were cautioned to provide "clear and concise explanations of their pricing methodology and their labor and burden estimating practice." Id.  Offerors were also cautioned against unbalanced and unrealistic pricing and were further advised that their pricing proposals "should reflect a clear understanding of work to be performed, take into account differences in skills, the complexity of varius disciplines, and professional job difficulty." Id.  Additionally, offerors were required to submit

> supporting documentation for the basis of direct labor, labor escalation, and each indirect cost consistent with their organization's cost accounting and estimating systems . . . .  If an Offeror does not currently have employees to fulfill the duties under a labor category or labor categories, the Offeror must explain its methodology for establishing Prime Contractor labor rates for such categories.

Id.

### 3.  Amendments to the Solicitation Prior to Proposal Submission

On August 10, 2010, the WHS conducted a preproposal conference with prospective offerors during which it represented that Task Order 1 and Task Order 2 would be concurrently awarded with the Basic Contract.  Id. at 6783.  Offerors' proposals were initially due by September 7, 2010.  Id. at 6784.  On August 30, 2010, the WHS issued Amendment 1, which extended the closing date for submission of proposals to September 13, 2010, provided responses to industry questions and comments, and modified, among other things, the requirements for offerors' oral proposal presentations.  Id. at 6484-598.  Amendment 1 also stated that the WHS "reserve[d] the right to reject proposals whose prices [we]re determined to be unreasonably high or low." Id. at 6598.  On September 7, 2010, the WHS issued Amendment 2, which corrected an administrative error, provided additional responses to industry questions and comments, and included replacement pages and attachments to the initial solicitation.  Id. at 6599-618.

### C.  Submission and Initial Evaluation of Written Proposals

The WHS received timely written proposals from fourteen offerors: [. . .]; Comint; DMI; [. . .]; NetCentrics; NetServices; [. . .]; PowerTek; and [. . .].  Id. at 13263.  The WHS assigned "pass" ratings to all offerors after determining that they submitted all required information specified in the solicitation by the closing date, unconditionally accepted the solicitation's terms and conditions, and possessed active top secret facilities clearances for all team members.  Id. at 16161-74; see id. at 16163 (containing Comint's eligibility requirements checklist), 16170 (containing NetServices' eligibility requirements checklist).  Because all fourteen offerors

received "pass" grades for each minimum eligibility criteria category, the WHS determined that all fourteen proposals were "eligible for award of a basic contract . . . ." Id. at 13233, 16161-74. Thereafter, the WHS notified all offerors in writing regarding their eligibility and invited them to participate in oral proposal presentations. Id. at 13233.

### D.  Oral Proposal Presentations

The WHS held a lottery to determine the order of presentations and commenced a two-week period for oral proposal presentations on September 21, 2010. Id. at 14400. During the first week, [. . .], NetCentrics, [. . .], Comint, [. . .], NetServices, [. . .], and [. . .] gave oral proposal presentations. Id. at 7365.1-.70, 8085-181, 8368-550, 9145-208, 10800-939, 11222-317, 11581-674, 12561-650, 14406-07. During the second week, [. . .], [. . .], PowerTek, [. . .], and DMI gave oral proposal presentations. Id. at 7618-811, 9467-576, 9964-10023, 12094-206, 12953-13046, 10343-419, 14407.

### E.  Amendments 3, 4, and 5 to the Solicitation

On December 7, 2010, the WHS issued Amendment 3 to the solicitation, which required offerors to resubmit their pricing worksheets in accordance with amended spreadsheets. Id. at 6619-83. Three days later, the WHS issued Amendment 4, which required offerors to either confirm the number of full-time equivalents proposed for Task Order 1 or resubmit that information in response to the amendment. Id. at 6684-85.

On January 19, 2011, the WHS issued Amendment 5 to the solicitation. Id. at 6686-714. In Amendment 5, the WHS explained that, in conjunction with an initiative to reduce overhead costs and eliminate redundant functions, efforts to consolidate the WHS and IT Management Directorate had been accelerated. Id. at 6688. As a result of the consolidation, the work designated under Task Order 1 and Task Order 2 "no longer reflect[ed] the Government requirements." Id. Consequently, the WHS would not award task orders concurrently with the Basic Contract award. Id.; see also id. at 16238 ("The purpose of amendment 005 was to revise [sections of the solicitation,] which changed task orders 0001 and 0002 from being awarded concurrent with the basic contract to being awarded after the award of the basic contract."). Task Order 1 and Task Order 2 were now identified as sample task orders, id. at 6689, 16238, and the WHS advised offerors that "pricing submittals for Task Order 1 and Task Order 2 w[ould] be used for evaluation purposes only for Factor 3: Price for award of the Basic Contract, as originally indicated in the solicitation to all offerors," id. at 6688. Offerors were also informed that Amendment 5 did not require submission of revised proposals and that the WHS would not accept any revisions. Id. Each offeror submitted to the WHS a signed copy of Amendment 5 before the January 26, 2011 deadline set forth in the amendment. See id. at 6962-94.

### F.  Evaluation of Offerors' Proposals

From October 2010 until December 2010, the Source Selection Evaluation Board ("SSEB") conducted evaluations of all fourteen proposals.  On December 16, 2010, the SSEB's chairperson briefed the Source Selection Advisory Council ("SSAC"), providing information about (1) the SSEB's evaluations, which analyzed the strengths and weaknesses of each offeror's technical proposal, (2) the results of each offeror's past performance evaluation, and (3) the results of an overall pricing evaluation.  Id. at 13262.  The SSAC reviewed the SSEB's report and, beginning on December 20, 2010, began deliberating in order to prepare its recommendation to the Source Selection Authority ("SSA").

#### 1.  Quality/Capability and Past Performance Factor Ratings

Following the issuance of Amendment 5, the WHS evaluated the Quality/Capability and Past Performance factors for the Basic Contract only.  The following table summarizes the SSEB's ratings of proposals:

| Offeror | Quality/ Capability | Past Performance | Total Evaluated Price (millions) |
|---|---|---|---|
| [. . .] | Good | Satisfactory Confidence | [. . .] |
| [. . .] | Good | Satisfactory Confidence | [. . .] |
| Comint | Marginal | Satisfactory Confidence | [. . .] |
| DMI | Outstanding | Satisfactory Confidence | $449.1 |
| [. . .] | Outstanding | Satisfactory Confidence | [. . .] |
| [. . .] | Marginal | No Confidence | [. . .] |
| [. . .] | Outstanding | Satisfactory Confidence | [. . .] |
| [. . .] | Marginal | Limited Confidence | [. . .] |
| NetCentrics | Oustanding | Satisfactory Confidence | $415.6 |
| NetServices | Outstanding | Substantial Confidence | [. . .] |
| [. . .] | Marginal | Satisfactory Confidence | [. . .] |
| [. . .] | Marginal | Satisfactory Confidence | [. . .] |
| PowerTek | Outstanding | Satisfactory Confidence | $474.0 |

10

| [. . .] | Marginal | Satisfactory Confidence | [. . .] |
|---------|----------|-------------------------|---------|

Id. at 13264.

### a. Comint's Proposal

The SSEB assigned to Comint a "marginal" Quality/Capability factor rating and determined that Comint had a "moderate to high associated risk of unsuccessful performance" because its proposal did "not clearly meet the requirements" and did not "demonstrate[] an adequate approach and understanding of the requirements."  Id. at 13269.

Under subfactor 1, program management, the SSEB determined that Comint's program management methodology was "inadequate and incomplete," did "not include a comprehensive description of [its] program management information system or quality control program," "did not specify" how industry standard tools would be integrated and used to improve its strategy, and did "not have an adequate organizational structure, processes, or tools to satisfy the major task functional activities" set forth in the solicitation's statement of objectives.  Id.  Under subfactor 2, corporate commitment, the SSEB determined that Comint failed to provide an organization chart of its business or provide clear lines of authority, responsibility and communication.  Id.  Comint did not demonstrate how its organization would perform work and commit business or corporate resources, and it "did not address how [it] intend[ed] to implement optimization through project management and contract administration efforts."  Id.  Under subfactor 3, internal and external resources, the SSEB determined that Comint "did not demonstrate [an] ability to provide adequate internal and external resources to respond to task order requests that encompass all major task areas" set forth in the statement of objectives and did not describe "current core capabilities and external capabilities in sufficient detail . . . ."  Id. Under subfactor 4, corporate experience, the SSEB recognized that Comint had "applicable experience" that demonstrated Comint's "ability to perform the entire breadth and scope of all nine major task functional activities specified in the RFP in all three classification levels . . . ." Id.  However, it determined that Comint was "not likely" to meet all six key objectives specified in the statement of objectives because it "lacked sufficient experience leading and managing a contract on the scale and scope of NIEITS."  Id.  Finally, under subfactor 5, subcontractor management, the SSEB determined that Comint's plan to ensure effective and seamless management of subcontractors was "weak" because it described "a very generic approach to subcontractor management that [was] inadequate and incomplete."  Id.

The SSEB assigned to Comint a Past Performance factor rating of "satisfactory confidence" based upon its determination that Comint would "be able to successfully perform the required effort based on [its] performance record.  Id. at 13270.

11

**b. NetServices' Proposal**

The SSEB assigned to NetServices an "outstanding" Quality/Capability factor rating and determined that NetServices had a "very low associated risk of unsuccessful performance" because its proposal met "all the requirements and demonstrated an exceptional approach and understanding of the requirements." Id. at 13283.

Under subfactor 1, program management, the SSEB determined that NetServices' methodology was "strong" and included a "comprehensive description of [its] program management information system and quality control program." Id. According to the SSEB, NetServices' approach employed, among other things, "well-defined processes for quality and risk management" and implemented a methodology that utilized industry standards. Id. Under subfactor 2, corporate commitment, the SSEB determined that NetServices' "detailed organizational chart" contained clearly defined lines of authority, responsibility, and communication. Id. Under subfactor 3, internal and external resources, the SSEB determined that NetServices' proposal "demonstrated [its] ability to provide adequate internal and external resources to respond to task order requests that encompass all major task areas" set forth in the statement of objectives. Id. Nevertheless, the SSEB noted that NetServices failed to address its ability to provide support outside the continental United States. Id. Under subfactor 4, corporate experience, the SSEB determined that NetServices had "significant applicable experience that demonstrate[d its] ability to perform the entire breadth and scope of all nine major task functional activities specified in the RFP in all three classification levels, and [was] likely to be able to meet all six key objectives" set forth in the statement of objectives. Id. Finally, under subfactor 5, subcontractor management, the SSEB determined that NetServices' plan "met the requirements" of the solicitation. Id. at 13284.

The SSEB assigned to NetServices a past performance rating of "substantial confidence." Id. It explained that the government had a "high expectation" that NetServices would successfully perform the contract based upon the fact that NetServices "demonstrated very relevant performance as a prime contractor on work that is essentially the same magnitude of scope, size and complexity of the effort" for all functional areas set forth in the statement of objectives. Id. Additionally, the SSEB observed that the quality of NetServices' past performance was "consistently outstanding." Id.

**2. Pricing Factor Evaluations**

The record contains an unsigned, undated price evaluation memorandum that addressed each proposal's price reasonableness. See id. at 13233-60. Based upon references to "sample" task orders, it appears that the memorandum was created after the WHS issued Amendment 5 on January 19, 2011. See supra Part I.E. It is also apparent that the contracting officer, David L. Price, created the memorandum as he was responsible for determining price reasonableness. See AR 13295.

In this memorandum, Mr. Price acknowledged that "all proposals met the minimum eligibility criteria" set forth in the solicitation.  Id. at 13236.  Nevertheless, only five of fourteen proposals–those submitted by [. . .], DMI, [. . .], NetCentrics, and PowerTek–"were determined to have a fair and reasonable price and [were] therefore eligible to be considered for a basic contract award based on initial offers."  Id.  The remaining nine offerors–[. . .], Comint, [. . .], NetServices, [. . .], and [. . .]–"were not eligible for award of a basic contract on their initial offer due to price related errors or assumptions, and/or unreasonable pricing . . . ."  Id.

### a.  Comint's Proposal

With regard to Comint's proposal, Mr. Price determined that Comint's Basic Contract and sample Task Order 2 prices were fair and reasonable.  Id. at 13240-41.  However, Mr. Price could not make a definitive price reasonableness determination on Comint's total evaluated price because, he concluded, Comint "made an incorrect assumption for Sample Task 1 . . . , which [could] only be overcome if discussions were held and the contractor were given an opportunity to revise its proposal."  Id. at 13240.  According to Mr. Price, Comint "[. . .]."  Id.  As a result of this assumption, Comint was "not eligible for contract award on initial offers."  Id.

### b.  NetServices' Proposal

With regard to NetServices' proposal, Mr. Price determined that NetServices' Basic Contract price was fair and reasonable.  Id. at 13249.  However, Mr. Price could not make a definitive price reasonable determination on NetServices' total evaluated price because, he concluded, NetServices "conditioned [its] pricing for both sample tasks on various incorrect assumptions that [might] impact [its] price, which can only be overcome if discussions were held and the contractor were given an opportunity to revise its proposal."  Id.  Mr. Price identified six pricing conditions in NetServices' proposal that, he determined, affected its price for sample Task Order 1:

[. . .]

Id.  Mr. Price also identified two pricing conditions in NetServices' proposal that, he determined, affected its price for sample Task Order 2:

[. . .]

Id. at 13250.  As a result of these conditions, NetServices was "not considered eligible for contract award . . . based on [its] initial proposal."  Id. at 13249.

### G.  SSAC Best Value Recommendation

On February 25, 2011, the SSAC submitted its best value recommendation to the SSA. Id. at 13261-93.  The SSAC determined that proposals submitted by DMI, NetCentrics, and

13

PowerTek represented the best overall value for awards of ID/IQ contracts and were "the most advantageous to the Government for meeting the requirements and objectives" reflected in the solicitation. Id. at 13261. The SSAC also determined that adequate competition existed among the fourteen offerors. Id. It recommended that Basic Contract awards be made without discussions, "as no increased value [was] perceived by establishing a competitive range or engaging in discussions, to the offerors representing the best value to the Government." Id. The SSAC explained that its recommendation was derived from both its comparative assessment of proposals based upon the evaluation criteria set forth in the solicitation and its analysis of the SSEB's evaluation of each proposal. Id.

## H.  SSA Decision Memorandum

On March 1, 2011, the SSA, [. . .], issued a Memorandum of Source Selection Decision in which she determined that the proposals submitted by DMI, NetCentrics, and PowerTek represented the best value to the government for contract award on initial proposals. Id. at 13295. The SSA based her decision upon her comparative assessment of competing proposals after considering the findings and recommendations of the SSAC, as well as upon the "consistent and complete manner in which the evaluation was conducted and applied in compliance with the evaluation factors and criteria" set forth in the solicitation. Id. at 13294. The SSA concurred with the SSAC's assessment that adequate competition existed among the fourteen offerors and that Basic Contract awards be made without discussions. Id.

The SSA explained that DMI, NetCentrics, and PowerTek "submitted proposals containing the best terms from a price and technical standpoint" and were "eligible for award based on their initial offers." Id. All three offerors, she indicated, proposed "exceptional" approaches and were assigned "outstanding" ratings for the Quality/Capability factor, had satisfactory performance records that resulted in "satisfactory confidence" ratings for the Past Performance factor, and had fair and reasonable total evaluated prices. Id. The SSA noted that she selected DMI, NetCentrics, and PowerTek after considering the relative importance of the evaluation factors and subfactors in the solicitation. Id.

The SSA acknowledged that [. . .] and [. . .] were eligible for an award based on their initial offers; however, she determined that neither offeror's proposal represented the best value to the government. Id. The SSA did not select [. . .], she explained, because its total evaluated price was greater than the prices proposed by the three awardees, and its Quality/Capability factor rating was lower than the ratings assigned to the three awardees. Id. The SSA did not select [. . .], she explained, because its total evaluated price was greater than the prices proposed by the three awardees, and its Quality/Capability and Past Performance factor ratings were lower than the ratings assigned to the three awardees. Id.

Finally, the SSA explained that the nine remaining offerors were ineligible for awards on initial offers and that she "did not deem there to be a significant value by establishing a competitive range and engaging in discussions." Id. at 13295. The SSA concurred with Mr.

14

Price that, "due to price related errors or assumptions, and/or unreasonable pricing, and/or lower rated proposals for evaluation Factors 1 and/or 2, . . . these nine offerors should not be selected." Id.

## I.  Contract Awards

On March 1, 2011, Mr. Price notified offerors that the WHS intented to award ID/IQ contracts to DMI, NetCentrics, and PowerTek.  Id. at 13296.  He advised offerors that the WHS would "not consider subsequent revisions" to proposals.  Id.  Furthermore, Mr. Price indicated that

> no response to this notice [wa]s required unless a basis exist[ed] to challenge the small business size status of the apparent successful offerors.  Any challenge must contain the basis for the challenge and detailed evidence supporting the claim that the proposed contractor(s) for award [wa]s not a small business concern.[12]

Id. (footnote added).

## J.  Debriefing Letters

On April 6, 2011, the WHS issued Basic Contract awards to NetCentrics, PowerTek, and DMI, id. at 13376-606, and Mr. Price provided to the eleven remaining offerors a notice of award that included the WHS's debriefing, id. at 13607-97.  Mr. Price summarized the awardees' evaluation ratings and total evaluated prices in his notice of award, indicating that each offeror received "outstanding" Quality/Capability factor and "satisfactory confidence" Past Performance factor ratings.

### 1.  Comint's Debriefing Letter

In its debriefing letter to Comint, the WHS summarized Comint's evaluation ratings and total evaluated prices.  Id. at 13618.  The WHS then identified numerous deficiencies that resulted in Comint's "marginal" Quality/Capability factor rating.  Id.; supra Part I.F.1.a.  For example, under subfactor 1, program management, Comint's proposal contained five "significant weaknesses" and an additional "weakness."  AR 13618.  Under subfactor 2, corporate commitment, Comint's proposal contained both a "weakness" and a "significant weakness."  Id.

---

[12]  NetServices, on March 8, 2011, submitted to Mr. Price a protest challenging any award to NetCentrics.  AR 13297-367.  According to NetServices, NetCentrics was not a small business for purposes of the NIEITS acquisition because it had to "unduly rely" on large subcontractors to perform the work.  Id. at 13297-301.  Mr. Price submitted NetServices' protest to the United States Small Business Administration ("SBA") on March 10, 2011.  Id. at 13370.  The SBA, on April 5, 2011, issued a formal size determination, concluding that NetCentrics was a small business for purposes of the NIEITS acquisition.  Id. at 13368-75.

at 13619.  Under subfactor 3, internal and external resources, Comint's proposal contained a "significant weakness."  Id.  Under both subfactor 4, corporate experience, and subfactor five, subcontractor management, Comint's proposal contained a "weakness."  Id. at 13619-20.

The WHS assigned to Comint a "satisfactory confidence" Past Performance factor rating. Id. at 13620.  However, with regard to price, the WHS indicated that Mr. Price could not

> make a definitive price reasonableness determination of the Offeror's Total Evaluated Price of [. . .] because the offeror made an incorrect assumption for Sample Task 1 . . . , which can only be overcome if discussions were held and the contractor were given an opportunity to revise its proposal.  Consequently, the offeror is not considered eligible for contract award on initial offers.

Id.

## 2.  NetServices' Debriefing Letter

In its debriefing letter to NetServices, the WHS summarized NetServices' evaluation ratings and total evaluated prices.  Id. at 13667.  The WHS then indicated that NetServices received an "outstanding" Quality/Capability factor rating based upon its "exceptional approach and understanding of the requirements."  Id.  For example, under subfactor 1, program management, NetServices' proposal contained three "strengths."  Id.  Under subfactor 2, corporate commitment, NetServices' proposal contained a "strength."  Id. at 13668.  Under subfactor 3, internal and external resources, NetServices' proposal contained a "weakness."  Id. Under subfactor 4, corporate experience, NetServices' proposal contained a "strength," and its proposal met the solicitation's requirements with respect to subfactor 5, subcontractor management.  Id. at 13669.

The WHS assigned to NetServices a "substantial confidence" Past Performance factor rating.  Id. at 13670.  However, with regard to price, the WHS indicated that Mr. Price could not

> make a definitive price reasonableness determination of the Offeror's Total Evaluated Price of [. . .] because the offeror conditioned [its] pricing for both sample tasks on various incorrect assumptions that may impact [its] price, which can only be overcome if discussions were held and the contractor were given an opportunity to revise its proposal.  Consequently, the offeror is not considered eligible for contract award on initial offers.

Id. at 13680.  The debriefing enumerated six instances in which Mr. Price determined that NetServices conditioned its pricing for sample Task Order 1 and two instances of conditioned pricing for sample Task Order 2.  Id. at 13680-81; supra Part I.F.1.b.

## II. PROCEDURAL HISTORY

### A. NetServices' Protest With the Government Accountability Office

On April 15, 2011, NetServices filed a protest with the Government Accountability Office ("GAO").[13] AR 13939.  In its protest, NetServices challenged the contract awards on several grounds: the WHS (1) failed to evaluate the proposals in accordance with the evaluation criteria, (2) refused to permit revised proposals after issuance of Amendment 5, (3) erroneously determined that NetServices conditioned its pricing proposal, (4) failed to conduct a cost/ technical tradeoff as required by the best value basis of an award, (5) failed to seek clarifications, and (6) failed to conduct a required price realism analysis.  See id. at 13939-68.  The GAO did not require the WHS to provide an agency report.  Id. at 14168.  On June 17, 2011, the GAO dismissed the protest.  Id. at 14170-72.

### B. Comint's Protest With the WHS

On April 18, 2011, Comint submitted a protest to the WHS.  Id. at 13701-734.  Comint challenged the procurement on several grounds: (1) Amendment 5, issued after all offerors submitted their proposals, made material changes to the solicitation; (2) the WHS unlawfully prohibited offerors from submitting revised proposals; (3) the WHS's evaluation of proposals was based upon work and pricing from the original solicitation, rather than upon the work and prices related to changed requirements; (4) the WHS arbitrarily determined that Comint was ineligible for a contract award by unilaterally deciding that Comint would make extra, unstated charges under sample Task Order 1; and (5) the WHS improperly and unlawfully awarded contracts to offerors that were not small businesses.  Id. at 13707-09.  Comint requested that the WHS suspend contract performance and reevaluate Comint's proposal or, alternatively, designate Comint a contract awardee.  Id. at 13722-23.

The WHS, determining that Comint's protest was untimely, denied the protest in its entirety on June 1, 2011.  Id. at 13737-47; accord id. at 13937 ("Amendment 0005 was issued on January 19, 2011.  COMINT acknowledged Amendment 0005 on January 20, 2011.  Thus, COMINT was required to protest the changes caused by Amendment 0005 no later than January 31, 2011.").  Nevertheless, the WHS addressed Comint's remaining protest grounds, determining that none had merit.  See id. at 13740 (concluding that Amendment 5 did not constitute a material change to the solicitation because it did not change requirements, terms and conditions, and the WHS's evaluation scheme), 13744-45 (determining that the WHS properly decided not to clarify Comint's proposal through discussions or revisions because the WHS had no obligation to seek clarifications from or conduct discussions with offerors), 13742-43 (determining that the WHS properly deemed Comint ineligible for a contract award because Comint "incorrectly assumed that . . . [. . .]" and that assumption "effectively took exception to the solicitation's fixed

---

[13]  [. . .] filed a protest with the GAO on April 18, 2011, AR 13748-61, that was dismissed by the GAO on June 7, 2011, id. at 13936-38.

price task order requirements" by predicating its price "on conditions that were not stated" in the solicitation), 13745-46 (concluding that the WHS did not act in bad faith, properly evaluated Comint's technical proposal, and properly awarded contracts to small businesses).

## C.  Proceedings Before the United States Court of Federal Claims

Comint filed a protest in the United States Court of Federal Claims ("Court of Federal Claims") on June 20, 2011.  NetCentrics and DMI intervened on June 21, 2011.  NetServices filed its own protest on June 23, 2011, and NetCentrics and DMI intervened the following day.  On June 24, 2011, the court consolidated both protests.  PowerTek intervened on June 27, 2011.

### 1.  Supplementation of the Administrative Record

Defendant filed the administrative record on June 28, 2011.  After discovering a computer error, defendant sought leave to file a corrected record.  Defendant then filed a corrected administrative record on June 29, 2011.

Comint and NetServices each filed a motion to supplement the administrative record ("motion to supplement") and a joint supplemental motion to supplement the administrative record ("joint supplemental motion").  In response, defendant and DMI moved to dismiss portions of both complaints.  Before briefing concluded on these pending motions, Comint and NetServices filed amended complaints.  In a July 15, 2011 ruling, the court granted in part and denied in part plaintiffs' motions to supplement, granted in part and denied in part as moot plaintiffs' joint supplemental motion, denied as moot the motions to dismiss, and directed defendant to file a complete administrative record.  See Joint Venture of Comint Sys. Corp. & EyeIT.com v. United States ("Joint Venture"), Nos. 11-400C, 11-416C, 2011 WL 3010681, at *1 (Fed. Cl. July 15, 2011).  Defendant filed a second corrected administrative record on July 21, 2011.

Shortly thereafter, NetServices filed a third motion to supplement, and Comint filed a second motion to supplement.  The court heard argument on these motions on July 27, 2011, but deferred issuing a ruling pending defense counsel's opportunity to confer with Mr. Price to determine the existence of materials referenced in plaintiffs' latest motions to supplement.  Defendant, on August 17, 2011, filed an amended administrative record that included a certification from Mr. Price.  The court conducted a status conference with the parties on August 22, 2011, after which it denied in part and denied in part as moot NetServices' third motion to supplement and denied in part and denied in part as moot Comint's second motion to supplement.

When it filed the amended administrative record on August 17, 2011, defendant noted that "a number of emails and drafts circulated among the members of the evaluation team had not previously been included in the record." Def.'s Notice Filing Administrative R. Am. Accordance Court's Orders 2.  Defendant included those documents in its submission, but set forth its

18

position that they were "not properly part of the administrative record" and did "not consider their inclusion a 'correction' of the record." Id. at 2 & n.1.  During oral argument on October 28, 2011, the court sua sponte raised the issue of whether certain documents were properly part of the record and directed defendant to file a motion to strike, which was filed on November 2, 2011.

Defendant submitted a total of 16,984 pages of documents, 14,395 pages of which defendant asserted comprised the complete record of the NIEITS acquisition.  See Def.'s Mot. Strike Certain Docs. Not Part Administrative R. 1 (arguing that documents appearing between pages 14,396 and 16,984 should be stricken from the record).  In its prior rulings on supplementation, the court sought a complete administrative record that contained final decisional documents and the bases for the agency's procurement decisions.  Defendant responded, in large part, by filing copies of draft versions of what later became final decisional documents and multiple iterations of the same or similar documents.  See, e.g., AR 14487-687, 14725-925 (containing duplicate copies of an October 9, 2010 SSEB report), 14926-77 (containing duplicate copies of an October 13, 2010 SSAC prebrief presentation); see id. at 13261-295, 16396-97 (containing a signed, final version of the SSAC's best value recommendation to the SSA dated February 25, 2011, and a draft portion of that decision dated March 1, 2011, respectively); see also id. at 5886-981, 15512-676, 15982-6015, 16100-22 (containing numerous draft best value recommendation reports).[14]  On November 18, 2011, the court granted in part and denied in part defendant's motion to strike.

## 2. Plaintiffs' Second Amended Complaints

While plaintiffs' second motions to supplement were pending, NetServices, on August 5, 2011, moved for leave to file a second amended complaint.  The court granted NetServices' motion on August 8, 2011.  See Joint Venture, 2011 WL 3471019 (Fed. Cl. Aug. 8, 2011).  Also on August 8, 2011, Comint filed a similar motion, which the court granted on August 9, 2011.

### a. Comint's Second Amended Complaint

Comint's second amended complaint contains two counts.  Count I "addresses and includes any method, means, or process, of any nature, by which COMINT becomes an Awardee in the current Solicitation (including any version of the Solicitation that is a modification, revision, replacement, extension, or successor thereto)."  Comint's Second Am. Compl. ¶ 144. Count II

> addresses and includes any method, means, or process, of any nature, by which the current Solicitation is modified, revised, withdrawn, terminated, or prevented

---

[14]  The court's citation to documents paginated at or after 14,396 is for illustrative purposes only and does not, in any way, indicate that these materials are part of the administrative record or appropriate supplements thereto.

> from going forward, so that COMINT is given an opportunity to become an
> Awardee in any new, or revised, replacement, successor, or reordered Solicitation,
> such as, but not limited to, any form of new bidding, or re-compete.

Id. ¶ 147.  Comint alleges that the WHS made "major changes" to the solicitation when it issued Amendment 5 but failed to cancel the solicitation or, in violation of the FAR, permit offerors to submit revised proposals.  Id. ¶¶ 101-03, 106-08.  According to Comint, the WHS committed "factual and legal error" by rendering its proposal ineligible for a Basic Contract award.  Id. ¶ 109.  Comint also alleges that the Quality/Capability factor rating it received from the WHS was "arbitrarily made low" and that the WHS's evaluation was arbitrary, capricious, and not in accordance with law.  Id. ¶¶ 112-13.  Comint claims that the WHS's denial of its agency protest, see supra Part II.B, constituted reversible error, Comint's Am. Compl. ¶¶ 127-42.  It requests that the court strike the WHS's evaluations or direct the WHS to designate Comint an awardee. Alternatively, Comint requests that the court terminate the acquisition and require the WHS to issue a new solicitation.

### b. NetServices' Second Amended Complaint

NetServices' second amended complaint contains ten counts.  In Count I, NetServices alleges that the WHS failed to conduct a new evaluation with revised proposals after it issued Amendment 5 in violation of FAR 15.206 and the Competition in Contracting Act of 1984 ("CICA"), Pub. L. No. 98-369, 98 Stat. 494 (codified as amended at 31 U.S.C. §§ 3551-3556). NetServices' Second Am. Compl. ¶¶ 53-59.  In Count II, it asserts that the WHS manipulated the award process and breached its duty to evaluate proposals in good faith.  Id. ¶¶ 60-67.  It contends in Count III that the WHS violated FAR 15.305(a) by arbitrarily failing to evaluate its proposal.  Id. ¶¶ 68-72.  NetServices avers in Count IV that it was subjected to disparate treatment based upon the WHS's determination that its proposal contained pricing conditions. Id. ¶¶ 73-77.  In Count V, it alleges that the WHS violated FAR 15.503(a) and 15.306 by failing to establish a competitive range and issue notices of exclusion, thereby preventing an excluded offeror from filing a preaward protest.  Id. ¶¶ 78-83.  It asserts in Count VI that the WHS violated FAR 15.305(a) by failing to evaluate its proposal in accordance with the solicitation's amended evaluation criteria.  Id. ¶¶ 84-93.  In Count VII, it alleges that the WHS violated FAR 15.305(a) by failing to conduct a cost/technical tradeoff.  Id. ¶¶ 94-99.  In Count VIII, it contends that the WHS failed to determine whether two of the awardees' prices were unrealistically low.  Id. ¶¶ 101-05.  It asserts in Count IX that the WHS did not treat each offeror equally; engaged in discussions with at least three, but not all, offerors; and did not conduct meaningful discussions. Id. ¶¶ 106-13.  Finally, in Count X, it alleges that the SSA failed to exercise independent judgment.  Id. ¶¶ 114-20.

NetServices seeks injunctive relief and an order directing the WHS to cancel the NIEITS acquisition and start anew.  Alternatively, NetServices seeks a declaration that the WHS must request proposal revisions from all offerors, reevaluate the revised proposals, and make new awards.

## III.  LEGAL STANDARDS

### A.  Bid Protests

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2006), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (Supp. IV 1998)).

### B.  Standing

Standing constitutes a "threshold requirement in every federal action."  Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  As an "indispensable part of the plaintiff's case," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), standing is "not a mere pleading requirement," Night Vision Corp. v. United States, 68 Fed. Cl. 368, 391 (2005).  "[T]he question of standing," the United States Supreme Court explained, "is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Standing must be determined "as of the commencement of suit."  Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

"[T]he plaintiff in a bid protest must show that it has standing to bring the suit."  L-3 Global Commc'ns Solutions, Inc. v. United States, 82 Fed. Cl. 604, 608 (2008) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  Although the Court of Federal Claims, an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III," Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003), the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has determined that 28 U.S.C. § 1491(b) "imposes more stringent standing requirements than Article III," Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

"The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)."  RhinoCorps Ltd. v. United States, 87 Fed. Cl. 481, 485 (2009).  The Federal Circuit has construed the term "interested party" as synonymous with the term "interested party" defined in the CICA.[15]  See Am. Fed. of Gov't Emps., 258 F.3d

---

[15]  The CICA, which "was designed to create a level playing field, upon which all qualified vendors would have a fair chance to compete for a share of the hundreds of billions of

at 1302.  In order to have standing as an "interested party," a protester must satisfy a two-part test.  First, the protester must demonstrate that it is an actual or prospective bidder.  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also MCI Telecomm. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation").  Second, the protester must demonstrate that it has a direct economic interest in the procurement.  Rex Serv. Corp., 448 F.3d at 1307.

In order to establish a direct economic interest in the procurement, a protester must demonstrate prejudice.  See Info. Tech. & Applications Corp., 316 F.3d at 1319 ("To establish prejudice, [a protester] must show that there was a 'substantial chance' it would have received the contract but for the alleged error in the procurement process."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice.").  Therefore, "prejudice (or injury) is a necessary element of standing."  Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370; accord Info. Tech. & Applications Corp., 316 F.3d at 1319; see also Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits.").  "It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'"[16]  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (quoting Info. Tech. & Applications Corp., 316 F.3d at 1319).

---

dollars spent by the Federal Government in procurement each year," H.R. Rep. No. 103-545(I), at 21 (1994), defines the term "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2)(A) (2006).

[16]  A protester must also demonstrate prejudice to succeed on the merits.  See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review.  See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

A protester's burden of establishing standing differs depending upon the nature of the protest. In postaward bid protests, a protester must show that it had a "substantial chance" of receiving the contract. Rex Serv. Corp., 448 F.3d at 1308. In other words, "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' . . . ." Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). By contrast, in preaward bid protests "there have been neither bids/offers, nor a contract award." Weeks Marine, Inc., 575 F.3d at 1361. Thus, the factual foundation for any "but for" prejudice analysis that is necessary under the "substantial chance" standard is absent in the preaward context. Id. Recognizing that a protester must "make a showing of some prejudice" in the preaward context, id., the Federal Circuit determined in Weeks Marine, Inc. that protesters establish standing by alleging a "'non-trivial competitive injury which can be addressed by judicial relief,'" id. at 1362 (quoting WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748, 763 (1998)). Since plaintiffs in this case filed postaward protests, they must demonstrate prejudice under the "substantial chance" standard, not the "non-trivial competitive injury" standard applied by the Federal Circuit in Weeks Marine, Inc.

## C.  Motion to Dismiss

The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). When considering a motion raised under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936). The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747. If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## IV.  DISCUSSION

Plaintiffs allege that they are interested parties whose direct economic interests were affected by the WHS's award of NIEITS contracts to DMI, NetCentrics, and PowerTek. See

Comint's Second Am. Compl. ¶ 9; NetServices' Second Am. Compl. ¶ 1.  Plaintiffs claim that, absent the WHS's procurement errors, they each had a substantial chance of receiving a Basic Contract award.  Defendant and defendant-intervenors, however, argue that neither plaintiff demonstrates prejudice for purposes of establishing standing.

As explained in Part III.B, supra, a protester must show that it had a "substantial chance" of receiving a contract award but for errors in the procurement process.  Rex Serv. Corp., 448 F.3d at 1308; accord Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (requiring that a protester establish that it could compete for the contract); Textron, Inc., 74 Fed. Cl. at 285 (requiring that the protester show that it "would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations").  Neither Comint nor NetServices has made the necessary showing of prejudice to establish standing.

### A.  Comint Lacks Standing to Bring Its Protest

Comint claims that the "marginal" Quality/Capability factor rating it received from the WHS was both erroneous and incongruous given Comint's Past Performance rating and evaluation.  It alleges that the WHS improperly identified a "weakness" in its proposal after Comint was precluded from elaborating upon its strengths due to pagination limitations imposed upon offerors: "[The Defense Department] thus marked down COMINT for not saying more, when more was not allowed under the Solicitation Instructions."  Comint's Second Am. Compl. ¶ 78.  Comint also alleges that the WHS erred by identifying its organizational structure as a "weakness" because Comint "assembl[ed] an exceptional organization and then, in the submission, described how the organization will perform the work.  [The Defense Department] ignored the submission context."  Id. ¶ 79 (emphasis added).  It contends that, absent these and other errors that contributed to its "marginal" Quality/Capability factor rating, Comint had a substantial chance of receiving a Basic Contract award.

These purported errors, however, are insufficient to demonstrate standing.  Comint does not show that its compliance with the solicitation's pagination restrictions was in any way prejudicial, particularly since those restrictions applied equally to all proposals.  Additionally, Comint does not show prejudicial error based upon a perceived disparity between its subjective characterization of its own proposal and the WHS's independent and objective evaluation thereof.

More importantly, even assuming that Comint's allegations are true, see USfalcon, Inc. v. United States, 92 Fed. Cl. 436, 450 (2010), Comint does not demonstrate that it had a substantial chance of receiving a Basic Contract award.  First, the Quality/Capability and Past Performance factors were evaluated independently and were not weighed equally.  See AR 160-61.  Indeed, the WHS accorded more weight to Comint's "marginal" Quality/Capability rating than its "satisfactory confidence" Past Performance factor rating.  Comint's Quality/Capability factor rating was neither related to nor contingent upon its Past Performance factor rating.  Therefore, any alleged "incongruity" Comint cites between its Quality/Capability and Past Performance

factor ratings is irrelevant and does not serve as a sufficient basis to establish prejudicial error.

Second, the WHS assigned to Comint the second lowest Quality/Capability factor rating. Id. at 337, 13618. Eight other offerors received higher Quality/Capability factor ratings. DMI, [. . .], [. . .], NetCentics, NetServices, and PowerTek each received "outstanding" ratings, and [. . .] and [. . .] received "good" ratings. Id. at 13264. In effect, Comint's proposal ranked, at best, ninth based upon its Quality/Capability factor rating. Ultimately, [. . .], and NetServices were not awarded Basic Contracts, and Comint does not allege that the WHS erred in its evaluation of those offerors' proposals. See Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 366 (2009) (explaining that, in a multiple-award contract, "prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error 'might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether'" (quoting Serco Inc. v. United States, 81 Fed. Cl. 463, 501 (2008))). Therefore, Comint does not show that, absent the WHS's purported error in assigning Comint a "marginal" Quality/Capability factor rating, Comint would have been in contention for a Basic Contract award when offerors with higher ratings were not in contention. See Labatt Food Serv., Inc., 577 F.3d at 1380 (determining that a protester lacked standing because there was "no connection" between the government's error and the protester's failure to secure a contract); Comm'ning Solutions Global, LLC v. United States, 97 Fed. Cl. 1, 8 (2011) ("Nevertheless, if, despite the alleged procurement error, the protestor would still not have been 'in contention' or still had a 'substantial chance' of obtaining the contract, then the protestor has not been prejudiced and lacks standing."); Textron, Inc., 74 Fed. Cl. at 285 (stating that a protester has standing only if it "would be in contention absent an unreasonable procurement decision or violation of applicable procurement regulations" (emphasis added)).

For the reasons stated above, Comint cannot make the requisite showing of prejudice. As a result, Comint does not establish that it has standing, and its protest must be dismissed.[17]

## B. NetServices Lacks Standing to Bring Its Protest

NetServices contends that it has standing based upon the following sequence of events: (1) the WHS gave NetServices "passing" grades for each "minimum eligibility criteria" category, thereby rendering NetServices' proposal eligible for a Basic Contract award; (2) during the course of the procurement process, internal WHS communications and preliminary drafts of best value and pricing documents suggested that NetServices was recommended for an award; (3) prior to making a final agency determination, the WHS changed its initial recommendation concerning NetServices' proposal; (4) the WHS eliminated NetServices' proposal based upon a

---

[17]  Having determined that Comint lacks standing because it cannot establish prejudice based upon its "marginal" Quality/Capability factor rating, the court need not address any alternative arguments raised by defendant and defendant-intervenors. See Hoopa Valley Tribe v. United States, 597 F.3d 1278, 1284 (Fed. Cir. 2010).

purportedly erroneous finding that NetServices conditioned its pricing, thereby rendering its proposal ineligible for an award; and (5) the WHS's final ineligibility determination conflicts with its earlier determination that NetServices was, in fact, eligible for an award. According to NetServices, it had a substantial chance of receiving a Basic Contract award and was, in fact, recommended for an award during the course of the WHS's evaluations of proposals. However, NetServices maintains that the WHS engineered an outcome by issuing Amendment 5 to the solicitation after it knew all offerors' pricing and then "flip-flop[ping]" on NetServices' eligibility determination. NetServices' Mot. J. Administrative R. 36.

Although the court assumes NetServices' allegations to be true, see USfalcon, Inc., 92 Fed. Cl. at 450, none supports NetServices' contention that, but for the WHS's alleged errors, it had a substantial chance of receiving a Basic Contract award. First, the court cannot entertain arguments that require consideration of materials that are not properly part of the record. As the court explained in its November 18, 2011 ruling granting in part and denying in part defendant's motion to strike, many of the materials upon which NetServices relies fall outside the scope of the court's Administrative Procedure Act ("APA") review of agency action because the record already contains the final determinations of the relevant agency decisionmakers. Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 347 (2004); accord Interspiro, Inc. v. United States, 72 Fed. Cl. 672, 674 n.2 (2006) (denying a motion to supplement the record with a draft document because the final document was incorporated by reference in the solicitation); see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."). Although NetServices raises an inference of bad faith or improper conduct on the part of the WHS, it never expressly alleged bad faith or improper conduct, and it never made a showing that the materials in question were necessary for effective judicial review. The court, in its November 18, 2011 ruling, struck from the record and the parties' briefs all references to these materials. Consequently, NetServices cannot rely upon these materials to show that it had a substantial chance of receiving a contract award absent the WHS's purported errors.

Second, NetServices has not shown any prejudicial error based upon the WHS's finding that NetServices' proposal satisfied "minimum eligibility criteria" at the beginning of the evaluation process and its subsequent finding that NetServices' proposal was ineligible for an award. The WHS was not required to conduct a substantive review of each offeror's proposal for the purpose of evaluating the "minimum eligibility criteria." To the contrary, the WHS's initial review was preliminary in nature, as evidenced by the assignment of a "pass/fail" grade for each minimum eligibility criteria category: (1) unconditional acceptance the terms and conditions of the solicitation; (2) submission of all required information in a timely manner; and (3) possession of active top secret facilities clearances on the date the proposal was submitted. Furthermore, the WHS made its initial eligibility determinations within eight days after proposals were

submitted.[18]  Given that the initial eligibility determination occurred at an early stage of the evaluation process, it is apparent that the WHS's evaluation was procedural, viz., it reviewed proposals to ensure they met "minimum" requirements.  Once the WHS determined that the proposals complied with the solicitation's requirements, it deemed them "eligible" for consideration on their merits.  It is therefore implausible that the WHS, within a mere eight days after receipt of fourteen proposals, engaged in a probing, substantive review of each proposal and rendered the final eligibility determination on the merits with a "pass/fail" grade.  Consequently, NetServices has not shown that the WHS's alleged error, i.e., rendering its proposal ineligible for an award during the course of the evaluation process when that determination conflicted with an earlier finding that NetServices was eligible based upon satisfaction of "minimum eligibility criteria," was prejudicial and that it was in contention for a Basic Contract award in the absence of that error.

Third, NetServices has not made a showing that, absent the WHS's error in determining its proposal was ineligible based on pricing conditions, it would have been in contention for an award.  NetServices received an "outstanding" Quality/Capability factor rating, along with DMI, [. . .], NetCentrics, and PowerTek, and received the highest Past Performance factor rating.  Nevertheless, the solicitation indicated that the importance of the Price factor increased as the Quality/Capability and Past Performance factors became equal.

NetServices' total evaluated price, the SSAC determined, was significantly higher than the prices proposed by the three awardees and did not represent the best value to the government.  See AR 13284 (indicating that NetServices' price was [. . .] higher than PowerTek's price, [. . .] higher than DMI's price, and [. . .] higher than NetCentrics' price).  NetServices' total evaluated price was also higher than the prices proposed by [. . .] and [. . .], both of which submitted proposals that were deemed eligible for a Basic Contract award.  Yet, the SSA determined not to award Basic Contracts to [. . .] and [. . .] because their proposals did not represent the best value to the government.  See id. at 13294 (determining that [. . .] price was [. . .] higher than PowerTek's price, [. . .] higher than DMI's price, and [. . .] higher than NetCentrics' price; determining that [. . .] price was [. . .] higher than PowerTek's price, [. . .] higher than DMI's price, and [. . .] higher than NetCentrics' price).  NetServices does not allege that the WHS erred in its evaluation of the pricing proposed by [. . .] and [. . .].  See Afghan Am. Army Servs. Corp., 90 Fed. Cl. at 366.  Consequently, NetServices does not show that the WHS's ineligibility determination constituted prejudicial error because it did not have a substantial chance of receiving an award given the SSAC's best value recommendation and the SSA's pricing analysis that informed her best value decision.  See Labatt Food Serv., Inc., 577 F.3d at 1380.

For the reasons set forth above, NetServices cannot make the requisite showing of prejudice.  As a result, NetServices does not establish that it has standing, and its protest must be

---

[18]  Offerors' proposals were due by September 13, 2010.  As noted previously, only those offerors that received a "passing" grade for each minimum eligibility criteria were invited to give oral proposal presentations.  Those presentations commenced on September 21, 2010.

dismissed.

## V.  CONCLUSION

Comint and NetServices lack standing to bring their protests.  Consequently, the court lacks jurisdiction over this consolidated bid protest and must, pursuant to RCFC 12(h)(3), dismiss plaintiffs' second amended complaints.  Accordingly, it is **ORDERED** that:

1.  Comint's motion for judgment upon the administrative record and for declaratory and injunctive relief is **DENIED**;

2.  NetServices' motion for judgment upon the administrative record and for declaratory and injunctive relief is **DENIED**;

3.  Defendant's motion to dismiss Comint's second amended complaint is **GRANTED**;

4.  Defendant's motion to dismiss NetServices' second amended complaint is **GRANTED**;

5.  NetCentrics' combined motion to dismiss plaintiffs' second amended complaints and for judgment on the administrative record filed is **GRANTED IN PART** and **DENIED IN PART AS MOOT**;

6.  DMI's motion to dismiss Comint's complaint is **GRANTED**, and its cross-motion for judgment upon the administrative record with respect to Comint is **DENIED AS MOOT**;

7.  DMI's motion to dismiss NetServices' second amended complaint is **GRANTED**, and its cross-motion for judgment upon the administrative record with respect to NetServices is **DENIED AS MOOT**;

8.  PowerTek's motion to dismiss Comint's second amended complaint is **GRANTED**, and its cross-motion for judgment upon the administrative record with respect to Comint is **DENIED AS MOOT**; and

9.  PowerTek's motion to dismiss NetServices' second amended complaint is **GRANTED**, and its cross-motion for judgment upon the administrative record with respect to NetServices is **DENIED AS MOOT**.

The clerk is directed to dismiss without prejudice Comint's second amended complaint and NetServices' second amended complaint for lack of jurisdiction and to enter judgment accordingly.  No costs.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **by no later than Friday, December 16, 2011**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

    **IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
